## FROST v. TEXAS GULF SULPHUR CO.
(No. 1835.)

Court of Civil Appeals of Texas. Beaumont. May 2, 1929.

Rehearing Denied May 15, 1929.

122

Harry Holmes, of Houston, for appellant.

A. D. Dyess, of Houston, and Jno. M. Corbett, of Bay City, for appellee.

O'QUINN, J.  C. M. Frost was plaintiff, and Texas Gulf Sulphur Company was defendant. They will be referred to as such.

Plaintiff sued defendant to recover commissions in the sum of $2,000, alleged to be due him by defendant in a certain real estate deal. The allegations of his petition were full, sufficient, and appropriate. Defendant answered by general demurrer, general denial, certain special denials, and specially that it had purchased a different interest in the property in question than that which it authorized plaintiff to purchase for it, and upon different terms, wherefore it was not liable to plaintiff for commissions. The case was tried to a jury. When the evidence was closed plaintiff moved the court for an instructed verdict in his favor for the amount sued for, which was refused. Defendant also moved the court for an instructed verdict in its favor, which was refused. The court then instructed the jury to return a verdict for plaintiff for $600, which was done, and judgment entered accordingly. Both parties duly excepted to the court's action and to the judgment, and the case is before us on the appeal of the plaintiff. Defendant filed cross-assignments of error.

The facts are practically without dispute. Defendant is engaged in sulphur mining. Mrs. Phœbe Frost Coulter of Fargo, N. D., wife of John Lee Coulter, and Mrs. Margaret H. Howard of Vienna, Va., wife of A. Randolph Howard, owned 200 acres of land at or near what is known as "Boling Dome" in Fort Bend county, Tex., a prospective oil and sulphur field. Plaintiff, Frost, was in the business of buying, selling, and leasing real estate for a commission. Mrs. Coulter is a cousin of Frost. In the early part of October, 1927, plaintiff called the attention of A. G. Wolf, who was the agent and representative of defendant company, to the Coulter and Howard tract of land, and inquired whether the company would be interested in buying a portion of the sulphur rights under this land, telling him who the owners were and that one of them, Mrs. Coulter, was a relative of his, and that prior to that time plaintiff and his brother, J. M. Frost, had handled the Coulters' and Howards' business in leasing said land, and that he (plaintiff) could make a trade for defendant if his company was interested. Wolf replied that at that time his company was not interested, but that if it should become so it would handle the deal through plaintiff. There were three oil leases on the land, negotiated by plaintiff's brother, but they did not cover the sulphur. Shortly after the first conversation, Wolf 'phoned plaintiff, and he went to Wolf's office, and Wolf told him he wanted to buy half of the sulphur rights under the west 50 acres of the 200-acre tract, for which he would pay $3,000, and that he wanted a lease of the sulphur rights under the middle 66 acres of said tract, for which he would pay $2,000, and authorized Frost to go ahead and make the deal if he could, instructing Frost to buy half of the sulphur under the west 50 acres in the name of H. E. Dodge and to take the lease of 66 acres in the name of D. E. Thomas. Wolf told Frost he would pay him 10 per cent. of the purchase price as a commission. After this agreement Frost prepared and forwarded to the owners of said land instruments for their execution, carrying out the contemplated purchase and lease, with drafts attached, with request that if they were willing to accept to sign the papers and send them for collection. The parties did not execute the conveyances, but Coulter wrote Frost relative to the matter. Frost informed Wolf of the letter and same was read to Wolf. Frost told Wolf that the Coulters and Howards wanted to sell the property, and urged him to get the trade closed as early as possible, because delay would mean increased cost to buy, and suggested that if Wolf wanted the trade closed the best thing to do was to send him (Frost) to see the parties and close the deal. Frost wired Mrs. Howard at Vienna, Va., near the city of Washington, that he had a good chance to sell her Boling mineral rights, and to wire where he could see her. She replied that she would be glad to have him visit her, or that she would meet him in Washington at any time and place he would designate, and that if necessary she could come to Texas. After getting this telegram, Frost had another conversation with Wolf, in which Wolf said he had changed his plans for purchasing, and he then told Frost that he wanted to buy half of the sulphur under the west 50 acres, for which he would pay $3,000, and that he wanted a 12 months' option on the other half at double that price, for which option he would pay $1,000, and the lease on the middle 66 acres, for which he would pay $2,000.

Frost then told Wolf that he (Frost) contemplated buying a one-fourth interest in the sulphur, and that he had sent a deed to the parties to be executed by them for three-fourths of the sulphur under the west ·50 acres, intending to take one-fourth himself. Wolf objected to this, and Frost agreed to and did refrain from making any effort to get any interest for himself, so that Wolf might buy one half of the sulphur and take an option on the other half. Frost then wired Mrs. Howard that he would arrive in Washington on Saturday morning and to meet him at the Mayflower Hotel, and Mr. ·and Mrs. Howard did meet him on his arrival. He then submitted his proposal for a sulphur lease on the middle 66 acres for $2,000, the purchase of one half of the sulphur under the west 50 acres for $3,000, and a 12 months' option at double that price on the other half of the sulphur under said 50 acres for $1,000. This offer was rejected, and the Howards informed Frost that one Farmer had closed a deal with defendant on 100 acres of land adjoining theirs for $110,-000; that Farmer had wired this information to the Coulters, at Fargo, and Coulter had wired them. Frost was not aware such deal had been consummated. Frost then wired Coulter that he had just learned of the Farmer deal and that he thought it best for Coulter to meet him in Houston. Mrs. Coulter replied to this telegram that her husband, John Lee Coulter, had already gone to Houston in response to Farmer's telegram. Frost replied to this telegram that he would meet Coulter in Houston, and, also wired Wolf as to the various telegrams, Farmer to Coulter, Coulter to the Howards, and that Coulter would be in Houston Monday following at the Rice Hotel, and that the Howards would do whatever Coulter did. Frost also wired his brother, J. M. Frost, concerning the matter, and requested him to meet Coulter and take him to Wolf's office, and also wired Wolf that he had wired his brother to meet Coulter and take him to Wolf's office. Wolf wired Frost that as there was apparently no chance to close a deal where he was, he had better return to Houston, which he did, advising Wolf of the time he would arrive. Immediately upon reaching Houston Frost 'phoned Wolf. This was at night, and next morning he called at Wolf's office.

When J. M. Frost, brother to plaintiff, C. M. Frost, received his brother's telegram to meet Coulter upon his' arrival at Houston, he went to see Wolf and told him about his brother's wire, and that he was taking his brother's place in the matter, and that he would meet Coulter and close the deal if he could. J. M. Frost then asked Wolf what trade he would be willing to make with Coulter, that he understood that sulphur royalties had changed very materially, and did Wolf want him to make Coulter a prop-

osition, and Wolf replied, "Let's wait and see what Coulter says." J. M. Frost met Coulter when he arrived in Houston. Coulter was all excited about the big deal Farmer had made, and asked Frost what he (Coulter) could get, and Frost told him that he did not know, but that he thought he could get a good price, and inquired of Coulter what he wanted to sell. Coulter replied that he did not know, that he wanted to familiarize himself with what had taken place, and that then he would determine what he would do. Frost then told Coulter that in his opinion the Tex- · as Gulf Sulphur Company, represented by Wolf, was the one to deal with, and that they would make him a good trade. Frost stayed with Coulter that night, and continued to talk with him in favor of the defendant. The next morning Frost 'phoned Wolf that Coulter was coming to his (Wolf's) office, but that Coulter was not ready to close a deal; that Coulter wanted to further investigate the matter and wanted to go to "Boling Dome" and familiarize himself with the situation. Coulter went to "Boling Dome" with a Mr. Judson, a representative and agent of defendant, and looked over the situation. When Coulter got back from this trip he had dinner with Judson at the hotel. After dinner, Frost saw Coulter and asked him if he had decided what he wanted to do—what he wanted to sell. Coulter said, "No," but that he was going to Wolf's office next morning and discuss the matter with Judson. Frost advised Coulter to sell as much of the property as possible and to. get as much as possible. Frost then 'phoned Wolf and asked whether he (Frost) should try to close a deal with Coulter, or would he (Wolf) handle the matter himself, and suggested that it might be better for Wolf to do so, and Wolf said, "All right," to let Coulter come up to his office. Frost advised Wolf not to offer Coulter within 20 per cent. of what he was willing to pay, because he (Wolf) was going to get the property. Coulter had told Frost so, and Frost so advised Wolf, to which Wolf replied, "All right." The next morning, by appointment, Frost met Coulter and Judson, and the matter was fully discussed. Frost testified: "During this conversation with Mr. Wolf, I did not discuss with him how much interest he was going to buy only in this way. I asked him if he wanted to tell me how much interest he wanted to buy and if he wanted me to make the trade for him or if he wanted to make it himself, and he said, 'Let's wait and see what Coulter thinks of it.'"

As a result of the negotiations with Coulter, defendant closed a deal with him and the Howards for the southwest 100 acres of land, together with all minerals and mineral substances thereunder, subject to certain oil leases, for a consideration of $20,000.

After Wolf told J. M. Frost what he did with regard to handling the matter himself,

Frost made no further efforts to close the deal, but constantly and actively supported Wolf in bringing about and closing the deal. The agreement to close the deal had been reached before C. M. Frost had returned to Houston, but the deed of conveyance had not been signed. When he (C. M. Frost) arrived in Houston from his Washington trip, he immediately saw Coulter and told him that he had made a good trade and to go right on with it, which he did, and the deal was concluded. At that time the conveyance had not been signed. He then saw Wolf and asked what about his commission. Wolf offered $500 and Frost's expenses on the trip to Washington. Frost insisted on 10 per cent. of the purchase price. Wolf then offered $600, which was 10 per cent. of the amount he had authorized Frost to pay for one half of the sulphur under the west 50 acres and option on the other half of the sulphur and a lease on 66 acres, which Frost refused, insisting that Wolf had agreed to pay him 10 per cent. of the purchase price, and that as the purchase finally consummated amounted to $20,000, his commission would be 10 per cent. of that amount, $2,000. Later Wolf tendered Frost a check for $1,000 in payment for the services of both Frosts, which was refused. This suit resulted.

The contentions of appellant are:

(a) Where a broker submits property to a prospective purchaser and such purchaser agrees that any purchase made by it of said property will be made through such broker, and subsequently such prospective purchaser employs the broker to purchase for it an interest in said property for a specified price, and agrees to pay the broker a commission of 10 per cent., and the broker is unable to consummate a purchase of the specified interest at the specified price, but during such negotiations brings the seller and the purchaser together and they consummate a purchase and sale of a different interest at a different price, the purchaser is obligated to pay the broker 10 per cent. upon the price for which he purchases the same; and

(b) A broker has earned his commission under a contract stipulating for its payment in case of a purchase on the terms stated, when he initiates the negotiations and brings the purchaser and seller together, from which seller, the purchaser, during such negotiations, buys direct on terms satisfactory to himself, though different from those limited to the broker, the purchaser being deemed in this case to have waived the terms to which the broker was confined.

To the above contentions of plaintiff defendant replies by appropriate counter propositions, contending:

(a) That as plaintiff failed to consummate the deal he was authorized to make, that is, had not procured the specified interest in the property at the specified price he was authorized to pay, and it not appearing that his failure to do so resulted from any fault of defendant, he was not entitled to a commission; and

(b) That as plaintiff failed to consummate the deal he was authorized to make, finding it impossible to do so at the price he was authorized to pay, and defendant had by direct negotiations with the seller purchased a different interest than that which it authorized plaintiff to purchase, and upon different terms, it was not liable to plaintiff for commissions in any sum.

Both parties urged that the court erred in refusing their requested peremptory instructions, and also that the court erred in instructing the jury to return a verdict in favor of plaintiff for $600.

The court did not err in refusing defendant's requested charge for an instructed verdict in its favor, but we think the court erred in charging the jury to return a verdict for plaintiff for $600. Our conclusion is that plaintiff's contention that he was entitled to recover the sum of $2,000, 10 per cent. of the purchase price paid by defendant for the property, should be sustained. While it is true that Frost did not consummate a deal in accordance with the terms of his instructions from defendant, yet, unquestionably, he did bring the seller and the purchaser together, and in accordance with the wish of defendant he did not try to close the deal himself, but assisted defendant in every way possible in closing the deal. Defendant employed Frost to negotiate the deal, and accepted the benefit of his efforts. Frost's authority or agency was at no time revoked, but all the time and throughout the deal he and his brother, with defendant's knowledge and consent, were actively engaged in assisting to close the trade. When Frost thought that defendant wanted only one-half of the sulphur under the land, he decided to try to obtain a one-fourth interest in the sulphur for himself, and when Wolf objected, he promptly refrained from trying to get same, and left the whole for Wolf to obtain, or such portion as Wolf might desire, and continued actively to support Wolf in bringing about the deal. While the general rule is that, for a broker to be entitled to his commissions under a contract stipulating for their payment in the event of his sale of given property upon stated terms, he must have produced a purchaser ready, able, and willing to buy the property upon the terms stated; yet it is equally as well settled that the broker is entitled to his commissions according to the contract if, while his employment is in force, he procures a purchaser to whom the owner directly makes a sale upon terms which are satisfactory to himself, though different from those limited to the broker. Goodwin v. Gunter, 109 Tex. 56; 185 S. W. 295, 195 S. W. 848; Keener v. Cleveland (Tex. Com. App.) 250 S. W. 151. This rule applies with equal force where the broker is employed to buy certain property

at a certain price, and finds that the trade cannot be consummated as per the terms of the contract with his principal, and while negotiations are pending and the broker is collaborating with his principal to close a deal, the principal concludes the purchase on terms acceptable to him, the broker is entitled to his commissions, though his principal buys more or less of the property in question than he authorized the broker to buy, and at a different price from that the broker was authorized to pay. Goodwin v. Gunter, 109 Tex. 56, 185 S. W. 295, 195 S. W. 848; Webb v. Harding (Tex. Com. App.) 211 S. W. 927; French v. McKay, 181 Mass. 485, 63 N. E. 1068; Ranson v. Weston, 110 Mich. 240, 68 N. W. 152; 9 C. J. p. 600, § 89.

There is no dispute as to the rate of the commission Frost was to receive. Wolf testified that he told Frost what he wanted Frost to buy, and that he would pay him 10 per cent. of the purchase price. Under the undisputed evidence Frost brought the purchaser and sellers together, and the purchaser, defendant, did buy such amount of the property in question as it desired and at such price as was satisfactory to it. The purchase price was $20,000. Therefore, Frost was entitled to his 10 per cent. of said sum, or $2,000.

The judgment of the court below should be here reformed so as to allow Frost to recover the sum of $2,000, together with interest thereon at the rate of 6 per cent. per annum from November 4, 1927, the date the purchase of said property was consummated, and it is so ordered.